IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| VAI, INC., | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO. 11-3906 |
| | : | |
| v. | : | |
| | : | |
| MILLER ENERGY RESOURCES, INC., | : | |
| f/k/a MILLER PETROLEUM, INC., and | : | |
| COOK INLET ENERGY, LLC, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM

**Jones, II, J.**                                                                                                   **October 31, 2013**

Plaintiff VAI, Inc. ("VAI") brings a Complaint against Defendants Miller Energy Resources, Inc., ("Miller") and Cook Inlet Energy, LLC ("CIE") alleging that Defendants: 1) breached their contract with VAI (Count I); 2) were unjustly enriched under the contract (Count II); and 3) breached their implied covenant of good faith and fair dealing (Count III). Now pending before the Court are Defendants' Motion for Summary Judgment ("Defs.' Mot. Summ. J."), Statement of Undisputed Facts ("Defs.' SOF"), as well as Response to Motion for Summary Judgment ("VAI Resp."), Response to Statement of Undisputed Fact ("VAI Resp. State. Undisp. Fact"), and Counterstatement of Undisputed Fact ("VAI Counter. of Undisp. Fact"). For the reasons set forth below, Defendants' Motion is granted in part and denied in part.

**I.    FACTS**

The Court recites the undisputed facts as viewed in the light most favorable to Plaintiff. VAI is a Delaware corporation that conducts business in Pennsylvania. VAI "provid[es] financial advisory and consulting services to companies seeking to acquire or divest businesses,

1

restructure, secure financing or investment capital, and other similar business transactions." (Compl. at ¶ 1); (CIE Answer at ¶ 1); (Miller Answer at ¶ 1).

Defendant Miller is a Tennessee corporation, "engaged in the operation of oil and natural gas wells in Tennessee, and beginning in 2009 became engaged in the production and sale of oil and gas in the Cook Inlet area of Alaska near Anchorage." (Compl. at ¶ 2); (CIE Answer at ¶ 2); (Miller Answer at ¶ 2).

Defendant CIE, a subsidiary of Miller, is an Alaska limited liability company, and engages in the production of oil and gas, operates oil and gas wells, and develops oil and gas producing properties located in the Cook Inlet area of Alaska. (Compl. at ¶ 3); (CIE Answer at ¶ 3); (Miller Answer at ¶ 3).

This case involves the acquisition of oil and gas assets in the Cook Inlet region of Alaska (Alaskan Assets). In January 2009, CIE was formed to acquire oil and gas properties located in Alaska (VAI Counter. of Undisp. Fact at ¶ 1); (Defs.' Mot. Summ. J. at ¶ 1). In June, 2009, CIE engaged VAI to "advise CIE and locate a lender or joint venture partner to raise money CIE needed to fund its acquisition" of Alaskan Assets. (Defs.' Mot. Summ. J. at ¶ 2); (VAI Resp. State. Undisp. Fact at ¶ 2). An Engagement Agreement was executed between CIE and VAI, which formalized the relationship between the parties. (Defs.' Mot. Summ. J. at ¶ 2); (VAI Resp. State. Undisp. Fact at ¶ 2). VAI drafted the Engagement Agreement. (Defs.' Mot. Summ. J. at ¶ 2); (VAI Resp. State. Undisp. Fact at ¶ 2). The Engagement Agreement stated that VAI's responsibilities involved "providing financial advisory services to [CIE], on an exclusive basis, focusing on the acquisition of *certain assets* of Pacific Energy Resources . . . " (Defs.' Mot. Summ. J. Ex. C) (emphasis added).

The Engagement Agreement additionally stated that VAI's "primary responsibility will be the review, sourcing and placement of private placement financing and/or joint venture alternatives available to the Company, including the raising of debt and/or equity capital (the 'Financing') in order to acquire *all the rights titles and interests* of Pacific Energy Alaska Holding, LLC, and Pacific Energy Alaska Operating, LLC, or hereinafter referred to as the Pacific Energy Alaska Assets (collectively the 'Assets')." (*Id.*) (emphasis added).

Under the terms of the Engagement Agreement, CIE was to pay to VAI an initial fee of $25,000, followed by a monthly fee of $20,000 between July 15, 2009 and August 15, 2009. After August 15, 2009, the monthly fee was then to be reduced to $15,000 for the remainder of the term. (*Id.*). In addition to the initial and monthly fees, and upon the securing of financing or the consummation of a joint venture to purchase the Alaskan Assets, VAI would receive the greater of a $500,000 fee, or a combination of debt/equity ownership. (*Id.*)

The Engagement Agreement also conveyed to VAI, upon closing of financing or consummation of a joint venture, "stock rights of up to 10% of the Company or Joint Venture Entity utilized to finance and acquire the Assets." (*Id.*). Finally, regardless of whether financing was secured or a joint venture consummated, and in addition to any other fees or compensation, VAI was to receive reimbursement for all reasonable out-of-pocket expenses related to its activities under the Engagement Agreement. (*Id.*)

On September 8, 2009, Miller, CIE and VAI executed a Memorandum of Understanding ("MOU"). (Defs.' Mot. Summ. J. Ex. G). The MOU stated that it "incorporates the entire understanding and agreement between the parties and supercedes [sic] all prior understandings and agreements between the parties, whether oral or written, with respect to the subject matter

hereof." (*Id.*). Additionally, the words "superseed [sic] previous MOU's" was handwritten in the upper-right hand corner of the MOU. (*Id.*). The MOU provided that:

> [i]n consideration of CIE and VAI assigning its rights attributable to the acquisition of the [Assets] to Miller and to the commitment by CIE and VAI to endeavor with Miller to maximize the value of such assets and related profitability, Miller agrees to the following:
> 
>   i. To facilitate the acquisition financing related to the asset purchase as described in the September 4, 2009 Communication to Pacific Energy Resources…
>   ii. To issue 3,500,000 warrants (exercisable at $.01) to CIE and VAI that will vest over a time period estimated at approximately 4 years.
>   iii. To enter into employment agreements with key employees of CIE consistent with the agreement related to the warrants described above.
>   iv. To provide $200,000 in cash consideration to CIE and VAI within 60 days of closing of the sale as partial reimbursement of costs and 'out of pocket' expenses incurred related to the Asset Purchase, to date.

(*Id.*).

Moreover, the terms of the MOU were "contingent upon the CIE or its assignee and/or Miller being designated as the successful purchaser of the assets from the Bankruptcy Estate of Pacific Energy Resources, Ltd. as generally described above," (*Id.*). The language above the contingency clause referenced a September 4, 2009 communication to Pacific Energy Resources. That communication stated in pertinent part that CIE "asked [Miller] to provide financing in an amount necessary to support [CIE] in . . . [p]ayment of costs and expenses associated with the purchase of the Alaska Group 1 assets . . . ." (Defs.' Mot. Summ. J. Ex. H at CIE00051). The communication further provided that "[t]he proposed acquisition will require approximately $470,000 plus closing costs (the 'Transaction'). Miller is providing this binding commitment to fund this amount, plus additional operating and capital funds should CIE be designated as the successful bidder." (*Id.*) The communication provided for the availability of the funds for closing on September 9, 2009, subject to the transaction receiving approval from the U.S. Bankruptcy Court in the District of Delaware on the same date. (*Id.*).

A second communication to Pacific Energy Resources included similar language, with a change in the transaction dollar amount from approximately $470,000 to a "total capital of $6,800,000." (VAI Resp. Ex. 9). The letter also indicated that Miller was "providing this binding commitment to fund $8,400,000 of this capital through the line of credit for $6,000,000 and through the purchase of equity of [CIE]." (*Id.*). The second letter contained the same closing date of September 9, 2009, subject to the transaction receiving same-day approval from the bankruptcy court. (*Id.*)

The bankruptcy court did not approve the transaction on September 9, 2009. (Defs.' Mot. Summ. J. Ex. D at p. 89, lines 4-23; p. 107, lines 14-18). Despite the absence of approval on September 9, 2009, the parties continued working to acquire the Alaskan Assets. VAI was included in this effort to acquire the Alaskan Assets as recently as November 2, 2009. (VAI Resp. Ex.16 at CIE00255). Around November 11, 2009, CIE was named the successful bidder of the Alaskan Assets. (VAI Resp. Ex.12). On December 8, 2009, CIE terminated VAI's services under the Engagement Agreement. (VAI Resp. Ex. 23 at CIE00034). CIE closed on the Alaskan Assets on December 15, 2009. (Defs.' Mot. Summ. J. Ex. D at p. 112 lines 12-14).

## II.   LEGAL STANDARD

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a summary judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c). In order to defeat a motion for summary judgment, disputes must be both (1) material, meaning concerning facts that will affect the outcome of the issue under substantive law, and (2) genuine, meaning the evidence must be such that a reasonable jury could

return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23. An issue is genuine if the fact finder could reasonably return a verdict in favor of the non-moving party with respect to that issue. *Anderson*, 477 U.S. at 248. In reviewing a motion for summary judgment, the court "does not make credibility determinations and must view facts and inferences in the light most favorable to the party opposing the motion." *Seigel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995).

### III.   DISCUSSION

#### 1. Count I - Breach of Contract

In Count One of the Complaint, Plaintiff seeks compensatory damages in connection with: 1) fees as described in the Engagement Agreement; 2) out-of-pocket expenses in pursuit of performing under the Engagement Agreement; and 3) 1,750,000 warrants for the common stock of Miller or, alternatively, the fair market value of such warrants.

"Summary judgment may be granted based on the interpretation of a contract only if the contract is so clear that it can be read only one way." *Battaglia v. McKendry,* 233 F.3d 720, 722 (3d Cir.2000). Where the meaning of the contract's terms "is unambiguous and can be interpreted only one way, the court interprets that contract as a matter of law." *Allied Erecting & Dismantling, Co. v. USX Corp.,* 249 F.3d 191, 201 (3d Cir.2001). But where "the contract as a whole is susceptible to more than one reading," the issue is one for the fact-finder to resolve. *Id.*

      A.      <u>**Engagement Agreement**</u>

### i. Conditions of Engagement Agreement

The "'fundamental rule in contract interpretation is to ascertain the intent of the contracting parties.'" *Kamco Indus. Sales, Inc. v. Lovejoy, Inc.*, 779 F. Supp. 2d 416, 427 (E.D. Pa. 2011) (quoting *Lesko v. Frankford Hospital–Bucks County*, 15 A.3d 337, 342 (Pa. 2011) (citation omitted); *see also Crawford Cent. Sch. Dist. v. Commonwealth*, 888 A.2d 616, 623 (Pa. 1982). In determining intent, "'all provisions in the agreement will be construed together and each will be given effect. [Pennsylvania courts] will not interpret one provision of a contract in a manner which results in another portion being annulled.'" *Kamco Indus. Sales, Inc.*, 779 F. Supp.2d at 427 (quoting *LJL Transp., Inc. v. Pilot Air Freight Corp.*, 962 A.2d 639, 647-48 (Pa. 2009)) (citations omitted).

"When a contract's terms are 'clear and unambiguous, the intent of the parties is to be ascertained from the document itself.'" *Id.* (quoting *Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.*, 905 A.2d 462, 468 (Pa. 2006)) (citation omitted). "However, when 'an ambiguity exists, parole evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is patent, created by the language of the instrument, or latent, created by extrinsic or collateral circumstances.'" *Id.* (citations omitted). "In addition, '[w]herever reasonable, the manifestations of intention of the parties to a promise or agreement are interpreted as consistent with each other and with any relevant course of performance, course of dealing, or usage of trade.'" *Id.* (quoting *Sunbeam Corp. v. Liberty Mut. Ins. Co.*, 781 A.2d 1189, 1193 (Pa. 2001) (citation omitted).

Defendants assert two arguments regarding conditions of the Engagement Agreement: 1) VAI's payment was contingent on CIE acquiring all rights, titles and interests in the Alaskan Assets; and 2) VAI's payment was contingent on CIE acquiring the Alaskan Assets as a result of

a "joint venture" or by "financing." (Defs.' Mot. Summ. J. at ¶ 11-15). With respect to Defendants' first argument, Defendants argue that CIE never acquired all rights, titles and interests in the Alaskan Assets. Rather, Defendants argue that they were able to acquire only a <u>portion</u> of the Alaskan Assets that had originally been for sale. As a result, despite CIE successfully acquiring the purchased assets, the condition of acquiring "<u>all</u> the rights, titles and interests" did not come to fruition.

In support of their second argument, Defendants claim that CIE did not acquire the Alaskan Assets as a result of a joint venture or financing. Defendants note that the Engagement Agreement defines a "joint venture" as a "new" or "merged" entity. (Defs.' Mot. Summ. J. Ex. C). Defendants argue that no new or merged entity was created because Miller purchased CIE as a wholly-owned subsidiary. Thus, both entities existed before and after purchase of the Alaskan Assets, and the entities did not merge, but rather Miller became the parent company of CIE. Defendants assert that the Engagement Agreement defines "financing" as "the raising of debt and/or equity capital." (Defs.' Mot. Summ. J. at ¶ 19). Defendants contend that because CIE became a wholly-owned subsidiary of Miller, and CIE had no obligation to repay Miller for the funds used to acquire the Alaskan Assets, no financing occurred as defined by the Engagement Agreement.

In ascertaining the intent of the parties, the contract provisions "focusing on the acquisition of certain assets" and "in order to acquire all the rights, titles and interests" must be read together and both given effect. *Kamco Indus. Sales, Inc.* 779 F. Supp.2d at 427 (Pa. 2009). Looking solely to the language of the Engagement Agreement, the provisions in question, read together, can have different effects. The provisions could be read together as initially describing VAI's role of facilitating CIE's acquisition of certain assets, and later categorizing those certain

assets as all the rights, titles and interests, in other words, all the assets. On this reading, the word "certain" is later modified to inform the reader that the class of assets includes all the assets. However, a second reading of the language provides that the class of assets the parties intended to acquire were "certain" assets, and that the parties sought to acquire "all rights, titles and interests" in those certain assets. Under this reading, the word "certain" modifies the class of assets in which the parties sought to obtain "all rights, titles and interests."

Turning to Defendants' second argument, if the definition of "financing" is "clear and unambiguous, the intent of the parties is to be ascertained from the document itself." *Ins. Adjustment Bureau*, at 468. The Engagement Agreement contains a section defining the terms used throughout the Agreement, including: "Joint Venture", "Senior Debt", "Tranche B/Secured Subordinated Debt", "Traditional Subordinated Debt", "Traditional Equity", "Total Consideration", "Transaction" and "Transaction Fee." (Defs.' Mot. Summ. J. Ex. C). Noticeably absent from the list of defined terms is "Financing." Defendants define "Financing" as "any debt or equity financing." (Defs.' Mot. Summ. J. at p.6). The pertinent section of the Engagement Agreement, however, read as a whole states that "VAI['s] primary responsibility will be the review, sourcing and placement of private placement financing and/or joint venture alternatives available to the Company, *including the raising of debt and/or equity capital (the 'Financing') . . . .*" (Defs.' Mot. Summ. J. Ex. C) (emphasis added). Though Defendants focus on the latter part of the phrase for their definition of "Financing", the entirety of the phrase discusses VAI's responsibilities with regard to the "Financing" and includes raising of debt and/or equity capital as one of the alternatives available. This reading, coupled with a lack of discrete definition included elsewhere for other material terms within the contract, does not lead to a clear and unambiguous meaning of "Financing."

Viewing the facts in the light most favorable to Plaintiff, the Engagement Agreement gives rise to a genuine issue of material fact. The contract language referred to by Defendants in their motion for summary judgment is susceptible to multiple readings. Consequently, summary judgment is inappropriate. Furthermore, because VAI is entitled to compensation under the Engagement Agreement in the event of a "Financing" or a "Joint Venture," and summary judgment is inappropriate under a reading of the term "Financing," the court offers no additional opinion regarding the meaning of the term "Joint Venture."

### ii. Doctrine of Novation

Defendants argue that under the doctrine of novation, the MOU substituted the Engagement Agreement, leaving Plaintiff unable to recover under the Engagement Agreement. "A substituted contract is a contract that is itself accepted by the obligee in satisfaction of the obligor's existing duty. The substituted contract discharges the original duty and breach of the substituted contract by the obligor does not give the obligee a right to enforce the original duty." Restatement (Second) of Contracts § 279 (1981). "A novation is a substituted contract that includes as a party one who was neither the obligor nor the obligee of the original duty." *Id*. at § 280.

"Under Pennsylvania law, '[t]he required essentials of a novation are 'the displacement and extinction of a valid contract, the substitution for it of a valid new contract, . . . .a sufficient legal consideration for the new contract, and the consent of the parties . . . .'" *Owen Healthcare, Inc. v. Franklin Square Hosp.*, 159 B.R. 453, 455 (E.D. Pa. 1993) (citing *Buttonwood Farms, Inc. v. Carson*, 478 A.2d 484, 487 (Pa. Super. Ct. 1984)) (citations omitted). Moreover, "[w]hether there is novation is ordinarily a question of fact." *Am. Acceptance Corp. v. Scott Hous. Sys.*, Inc., 630 F. Supp. 70, 75 (E.D. Pa. 1985).

"The party asserting a novation . . . has the burden of proving that the parties intended to discharge the earlier contract." *GE Capital Mortg. Services, Inc. v. Pinnacle Mortg. Inv. Corp.*, 897 F. Supp. 854, 864 (E.D. Pa. 1995) (quoting *Buttonwood Farms, Inc.,* 478 A.2d at 486). Such intention "may be shown by other writings, or by words, or by conduct or by all three." *Id.* Where the moving party has come forward with evidence establishing the undisputed facts required for judgment in its favor "the party resisting summary judgment . . . has the burden of coming forward with sufficient evidence of record to demonstrate that there is a genuine issue of material fact in dispute in order to justify denial of the motion." *Owen Healthcare, Inc.*, 159 B.R. at 456 (E.D. Pa. 1993).

Here, the parties disagree on the last element of novation, namely the consent of the parties. Acknowledging that novation is ordinarily a question of fact, the initial question is whether the Defendants have met their burden of showing that Plaintiff intended to discharge the Engagement Agreement. To prove this intent to discharge, Defendants point to the language of the MOU stating that "[t]his MOU incorporates the entire understanding and agreement between the parties and supercedes [sic] all prior understandings and agreements between the parties, whether oral or written, with respect to the subject matter hereof." (Defs.' Mot. Summ. J. Ex. G).

Assuming Defendants have established evidence that would support judgment in their favor, the burden shifts to Plaintiff to present evidence demonstrating a genuine issue of material fact to justify denial of the motion for summary judgment. Plaintiff points to the handwritten note "superseed [sic] previous MOU's" contained in the upper right-hand corner of the MOU. (Defs.' Mot. Summ. J. Ex. G).

Plaintiff contends that the intent of the parties was not that the MOU displaced the Engagement Agreement, but rather that it displaced previous drafts of MOUs. Plaintiff thus

argues that, aside from warrant rights, the Engagement Agreement was left intact, and that the MOU represented the final draft of an obligation between the parties in addition to the Engagement Agreement.

Viewing the facts in the light most favorable to the Plaintiff, Plaintiff has offered sufficient evidence of a genuine issue of material fact. If the handwritten note indeed indicated an intent only to displace previous MOUs, then the element of novation requiring consent of the parties was clearly not established. A reasonable fact-finder could return a verdict in favor of Plaintiff on the issue of novation. As a result, summary judgment on the issue is inappropriate.

### B.     Memorandum of Understanding

Defendants' sole assertion with regard to the MOU is that Miller's obligation to provide VAI compensation was contingent on Miller agreeing to "facilitate the acquisition financing related to the asset purchase as described in the September 4, 2009 Communication to Pacific Energy Resources[]."(Defs.' Mot. Summ. J. Ex. G). Defendants reliance on provisions in the September 4, 2009 letter as the basis for failure to meet the contingency mischaracterizes the MOU; those provisions do not reference or describe the assets, but rather the cost and anticipated date of closing.

The language immediately preceding the above quoted text states:

> *In consideration of* CIE and VAI assigning its rights attributable to the acquisition of the Alaska Group 1 Assets to Miller and to the commitment by CIE and VAI to endeavor with Miller to maximize the value of such assets and related profitability, *Miller agrees to the following*:

(*Id.*) (emphasis added).

Rather than a contingency on VAI's compensation, the provision, read in its entirety, seems to establish the bargained-for obligation imposed on Miller in exchange for any rights CIE

and VAI had with respect to the acquisition of the Alaskan Assets. A plain reading of the MOU further confirms this, as the contract places a contingency on VAI's compensation. (*Id.*).

In that letter, Miller stated it would provide "financing in an amount necessary to support [CIE] in [p]ayment of costs and expenses associated with the purchase of the Alaska Group 1 assets[.]" (Defs.' Mot. Summ. J. Ex. H at CIE00051). In that same letter, Miller anticipates that the purchase will cost approximately $470,000 and states Miller will provide those funds on September 9, 2009. (*Id.*) Defendants contend that the purchase price and closing date represent further contingencies on VAI's compensation under the MOU. Defendants further argue that because the asset acquisition cost more than $470,000 and occurred after September 9, 2009, the contingency was not met and no payment to VAI was triggered.

Defendants' argument is problematic for two reasons: First, even before the September 9, 2009 closing date, Miller issued a second letter on September 8, 2009 to Pacific Energy Resources with nearly identical language. One noticeable change, however, is that the anticipated purchase price changed from $470,000 to $6,800,000. Miller's sending of a second letter with a changed purchase price prior to the September 9, 2009 "deadline" casts doubt on the claim that the original letter was an added contingency. Thus, even upon a charitable reading of Defendants' argument, a genuine issue of material fact exists and the argument must fail for summary judgment purposes.

### 2. Count II - Unjust Enrichment

In Count Two of the Complaint, Plaintiff alleges that Defendants were unjustly enriched as a result of Plaintiff's performance, and seeks compensatory damages identical to those stated in Count One.

"A plaintiff is permitted to plead alternative theories of recovery based on breach of contract and unjust enrichment in cases where there is a 'question as to the validity of the contract in question.'" *Premier Payments Online, Inc. v. Payment Sys. Worldwide*, 848 F. Supp. 2d 513, 527 (E.D. Pa. 2012) quoting *AmerisourceBergen Drug Corp. v. Allscripts Healthcare, LLC*, No. 10-6087, 2011 U.S. Dist. LEXIS 83582, at *11 (E.D. Pa. July 29, 2011) (dismissing claim for unjust enrichment where neither party contested validity of contract). "Where the existence of a contract is uncertain, pleading in the alternative is permitted, even though a plaintiff cannot recover under both theories." *Premier Payments Online, Inc.*, 848 F. Supp. 2d at 527 (E.D. Pa. 2012). However, "[u]nder Pennsylvania law, 'the quasi-contractual doctrine of unjust enrichment [is] inapplicable when the relationship between parties is founded on a written agreement or express contract.'" *Philadelphia Hous. Auth. v. CedarCrestone, Inc.*, 562 F. Supp. 2d 653, 655 (E.D. Pa. 2008) quoting *Benefit Tr. Life Ins. Co. v. Union Nat'l Bank of Pittsburgh*, 776 F.2d 1174, 1177 (3d Cir.1985) (citations omitted).

Here, Plaintiff asserts both a breach of contract claim and an unjust enrichment claim. Plaintiff states that by Defendants' own arguments, the separate cause of action of unjust enrichment is allowed. According to Plaintiff, Defendants' claim that Plaintiff is not entitled to compensation under both the Engagement Agreement and MOU amount to Defendants claiming that neither contract is valid. However, Defendants do not claim that the Engagement Agreement and MOU are invalid. Rather, Defendants claim that the valid Engagement Agreement was superseded by the valid MOU, and that Plaintiff did not meet conditions set forth in the valid MOU to trigger payment. Under Defendants' theory of the case, a valid MOU existed. Under Plaintiff's theory of the case, both a valid MOU and Engagement Agreement existed. Because

either theory involves a valid contract, unjust enrichment is unavailable to Plaintiff as a separate cause of action, and summary judgment is granted as to Count II.

### 3. Count III - Implied Covenant of Good Faith and Fair Dealing

Plaintiff asserts that Defendants' actions violated the implied covenant of good faith and fair dealing, and seeks compensatory damages identical to those stated in Count One.

Under Pennsylvania law, "the implied covenant of good faith does not allow for a claim separate and distinct from a breach of contract claim. Rather, a claim arising from a breach of the covenant of good faith must be prosecuted as a breach of contract claim, as the covenant does nothing more than imply certain obligations into the contract itself." *JHE, Inc. v. S.E. Pennsylvania Transp. Auth.*, No. 1790, 2002 Phila. Ct. Com. Pl. LEXIS 78, *13; see also *LSI Title Agency, Inc. v. Evaluation Services, Inc.*, 951 A.2d 384 (Pa. Super. Ct. 2008); see also *Cummings v. Allstate Ins. Co.*, 832 F. Supp.2d 469, 472 (E.D. Pa. 2011).

"In Pennsylvania, a covenant of good faith and fair dealing is implied in every contract. Pennsylvania law does not, however, recognize an independent claim for breach of the implied covenant of good faith and fair dealing." *Temple U. Hosp., Inc. v. Group Health, Inc.*, No. 5-102, 2006 U.S. Dist. LEXIS 1548 *16 (E.D. Pa. Jan. 12, 2006) quoting *Lyon Fin. Servs. v. Woodlake Imaging, LLC*, No. 04-3334, 2005 U.S. Dist. LEXIS 2011, *21 (E.D. Pa. Feb. 9, 2005) (citations omitted). "[T]here may be an express or implied covenant of good faith and fair dealing in any contract between the parties, but if so, its breach is a breach of contract rather than an independent breach of a duty of good faith and fair dealing." *Temple U. Hosp., Inc.*, No. 05-102, 2006 U.S. Dist. LEXIS 1548 *15 (E.D. Pa. 2006 Jan. 12, 2006) quoting *Engstrom v. John Nuveen & Co.*, 668 F. Supp. 953, 958 (E.D.Pa.1987).

Because Pennsylvania does not recognize the implied covenant of good faith and fair dealing as a cause of action independent from a breach of contract claim, summary judgment is granted as to Count III.

## IV. CONCLUSION

For the preceding reasons, Defendants' Motion for Summary Judgment will be granted in part and denied in part. Defendants' Motion for Summary Judgment is granted as to Counts II and III and denied as to Count I. An appropriate order follows.